162116 ABT Holding Company v. Garnet Biotherapeutics Inc. 162116 ABT Holding Company v. Garnet Biotherapeutics Inc. Good morning, Your Honors. Excuse me. This interference that's involved in this appeal had two patents and an application for FERC and two applications for HO. And it relates to cell populations that co-express two markers, 49C and 90. And there were two issues, root description and interference in fact. And the two HO specifications are intrinsic evidence in this case. And they contain two definitions, two different definitions of co-express. The broader definition states that the two markers can be identified. Let me ask you a question that bothers me quite a bit. In the red brief, Apelli states that Dr. Verfiles, am I saying that right? Verfiles publication in blood experimental hematology was retracted, which is a significant event for a scientist. And in your gray brief, you say HO argued at numerous instances in its brief, in particular with regard to a lack of written description, support for FERC 118, such that data presented in two research publications by the FERC inventors had been falsified. Such allegations of inequitable conduct by HO in its original list of proposed motions were expunged by the board as improper. Indeed, the board did not allow HO to submit such a motion and made no findings regarding the issue. That statement doesn't resolve Apelli's statement for me. I want to know whether Dr. Verfiles' publication in blood and experimental hematology was retracted. It was retracted, yes, Your Honor. Because it's never discussed. It was not discussed because the board didn't decide that issue. The board specifically said at the very end of the decision that the whole question of inequitable conduct or all of that was not a decision that they made, and so we didn't discuss it. I will tell you that all of that information was given to the examiner. It was all reviewed, and these cases were issued or allowed and issued over that. Yeah. It looked like it was obfuscation, and that's why I was concerned. No. Okay. That's a fair answer. Nothing that's important to this particular opinion. Fair answer. Okay. So going back to this question of co-expression, when you look at the decision, it talks about just on a cell, whereas that definition says that it would be an expression in a collection of cells. So the board's decision, by not considering that second definition, was wholly defective, and it should be remanded so that they look at both definitions and not just the narrow one. And the reason why that is important is because it... Now, where's the narrow definition found? The narrow definition is in the 244 application of hope. It is in the appendix. It's page 119, I believe. Okay, let me just... Okay. So the narrower definition... Where is it, 119? Yeah, it's appendix page 119, which is page 12, and it talks about... Okay. At the very bottom of the page, it says... Actually, this is the broader definition. It says co-express or co-expresses, and then at the top of page 13, appendix page 120, it says on or in a single cell or alternatively on or in a collection of cells. In the other application, the 244 application, this is the 685, it stops before that semicolon, and it simply says on or in a single cell. Where is that? That is... I have the 244, appendix 7, I guess it is. Yes, it's page... It's appendix page 57, and it's line 19 and 20. It says co-express, if used here, and refers to the simultaneous detection of two or more molecules on or in a single cell. So, as you can see, the definition that the board used is the one that's on appendix page 57 that talks about a single cell. They never looked at the one that's on appendix page 120 that talks about one or in a collection of cells.  it permeates the entire decision-making process with respect to the 037 patent and the 256 application. Now, the 118 patent, I want to talk about separately. Why is that a mistake? They chose a definition. They chose a definition from the 244, right? They took that definition, but they never even acknowledged the fact that there was a different definition. If they had said, Your Honor, there are two definitions and we choose this one, not this other one, then that would have been different, but that's not what they did. They took the narrower one and they never acknowledged that there was a broader definition that they could have looked at. And that's the point. We think they should have looked at the broader definition because it would have made a difference in terms of their... You're saying if they'd looked and said, Here's this, here's A, here's B, we choose A, instead of just choosing A, there wouldn't be a problem. There might still be a problem, but that's not the problem here. The problem here is there's a broader definition and we explain in here why it would make a difference if you use the broader definition. And the only way to fix that is to send it back to the board to have them look at it and reconsider the evidence with the broader definition. And the reason is, when you look at the dean's declaration and how this whole definition of what you have to show in terms of it being expressed on cells, it's the position of Hull that you have to do simultaneous detection on a single cell. Whereas what was done in the dean's experiment is he had two aliquots. He tested for one marker in the first aliquot, then he tested on the second aliquot, and then he said because of testing both of those, that means that it satisfies the limitation with respect to co-expression. But you're saying on the narrow definition there's no interference in fact, and on the broader definition you would want to remand? For the broader definition with respect to determining interference in fact, yes, Your Honor. So, I also want to just point out a second thing with respect to that, and that is that it shouldn't make a difference whether they decide no interference in fact first or they decide written description first. You should get the same result with respect to the patentability of these particular claims. But that's not what happened here. Here the board first went through and analyzed written description. So they said, we're going to look at written description of the FERC claims using the Hull specifications, and that's appropriate. That's what the law says. So they went through that and they said, well, you don't have written description under that. Now, if they had used the correct definition, we think they would have, but under the definition they used, they said you don't have that. Then they went forward and said, nevertheless, we're going to look at the no interference in fact, and then when they went through and did that, they still continued using that definition rather than looking at what is the... Did FERC copy the definition of co-express from the 244? We did not copy any definition of co-expression. In fact, Your Honor, we didn't even ask for the interference. We put in a claim that was a broader claim in a sense. It doesn't recite the 91% we're talking about here, and the Patent Office decided to take not only the application where we had copied that, the 256 application, and put it into interference, but they brought in the 037 patent, which it issued several years before that had no limitation with respect to percentage, and they brought in the 118 patent that doesn't even recite these two markers. So it was not something that we asked for. It was kind of thrust upon us, and that's part of my point here. When you look at the 118 patent, it was judged on the specification of the 118 patent. They looked at the claims and they said, okay, we're going to judge those that way, but with respect to the 037 and the 256 cases, they looked at it and they said, well, because you asked for an interference, we're not going to look at your specification. We're going to look at the specification of Ho, and figure out what your claims are. If there's no interference, there's no reason to continue looking at the Ho application. You look at the FERC application. What does the FERC application say, and what do those claims say? They don't have a percentage. The application does say that it's a, that you co-expressed, that you have both markers. So if you were only looking at the FERC applications, and the FERC specifications, then there wouldn't be a problem with respect to these claims. It's only because of how they did the analysis, the order they did them, that an issue arises. Now, one of the problems the board had was with the Deans, found, didn't give a lot of credibility, solved problems in the Deans' analysis. Is that correct? They looked at Deans. First of all, let me be clear that the Deans' application was, declaration was not done for purposes of starting an interference. It was work that had been done before. But when you look at the Ho application, these, all six of these factors, they have a very broad range. And they say, you know, you can vary this, you can vary this, you can vary this, and yet you still get our claim cells. That's what they say in Ho. And what FERC did was, rather than repeating the experiment, to example one, he had done experiments in which he had done things that were within FERC, but also within Ho, and he said, here are the results, and the results showed greater than 91% of both of these markers being expressed. But because of the definition that had been used, the board said, first, both that it wasn't inherent, and that it didn't satisfy the definition. Okay, let's hear from the other side, and we'll save you rebuttal time. Okay, Your Honor. Is there any other point you want to vary? Well, there was, I just wanted to, I didn't get a chance to talk at all about the 118 claims, because you were asking about the 137 claims. But I can do that during my rebuttal time if you prefer, Your Honor, but I wouldn't give them a chance to. Well, no, I think maybe take another minute and outline what you want to tell us. Okay, all right, with respect to the 118 claims, the literal words of the claim are in the FERC specification. The Ariadne and AbbVie are not applicable, because those claims, in those other cases, were directed to a large genus, and those claims didn't have the structural and functional limitations that we have here. We have that we recite the claims are multipotent, that they're non-embryonic, that they're non-germ cells, that they can differentiate into various cell types, that they've undergone 10 to 40 cell doublings, and they recite the expression of telomerase. So they have all of those things. And the other point that I want to make, Your Honor, is Ho says you can get it from any tissue. Why should it not be true that we can get it from any tissue? And the last one is just the board goes to a particular passage, and they say, yes, you show mouse, brain, liver, bone marrow, but you only show human bone marrow. And here's one passage that shows that mouse doesn't act the same way human does. Well, that's at zero days. But there's a passage, the very next sentence says, at 14 days, they do act the same. And if you used for the human cells to isolate brain and liver in the same way that you did for the bone marrow, you would expect it to work the same way, in exactly the same way that for mouse, the procedures used work for all three tissues. Thank you. Thank you, Mr. Huntington. Okay. Mr. Dowd. Good morning, Your Honor. May it please the court, Matthew Dowd for the Appellee Garnet Biotherapeutics. I'd like to pick up right where my colleague left off with the 118 patent, but also directly address your question, Judge Wallach, about our comment about for FI and falsified data. And I want to clarify that, because I think it's important, particularly for the 118 patent. We're not raising the inequitable conduct issue. That issue is something that's been raised and is still alive and goes back down. But the falsification of data is directly applicable to the written description analysis of the 118 claim. Both experts acknowledge that. We have expert testimony on that. And it all goes to the predictability of the field and of the art. And so we have a situation where a university researcher published articles in Nature, in Blood, some of the top journals. They're retracted. Both experts on both sides say this is a significant event. The university said this was falsified. So it all goes to the predictability and the state of the art. And it sort of turns me to another issue I'd like to just raise very briefly, is when, if you look at the blue brief in this case, and this is how we responded with the red brief, they're almost all factual issues that were raised. And we responded in kind. And as the court knows well, the standard of review is substantial evidence. And this is a battle of the experts for a lot of those factual issues. There's testimony on both sides. There are five volumes of joint appendix. I counted last night. We have 50 articles, 50 peer-reviewed articles that are cited. So we think that in almost every issue that was raised, there's substantial evidence supporting the board's conclusion. Now, with that being said, I'd like to turn back to the issue about claim construction. Now, again, the appellant rests a lot of their appeal, at least in the blue brief, about factual issues. But I'll pause it for a second, but I'll turn back to it. The claim construction issue is a red herring. And to the extent that we didn't make that as clear as possible in the brief, I apologize to the court. But let me explain why. And it goes back to two reasons. One, with respect to your comment, Judge Schall, FERC did copy these claims. They said they're copying the claims. Yeah, they said 2597, FERC asked that an interference be declared between the above-captioned application, its application, and the HO 244 application. Correct. Doesn't that necessarily bring in the definition or the discussion about co-expression in HO 244? Correct, HO 244. But, and this has been- Where it has to be on one cell. Let me step aside for a second. I think if you look at the data, we don't dispute that the distinction between one-cell testing versus a population-cell testing, it doesn't matter in terms of the conclusion of the board. And again, perhaps I didn't make that as clear as possible in the red brief. But what makes the difference with respect to the claim construction is what FERC was arguing, was that you have to look at the 685 patent. And there, there's some discussion, and my colleague didn't really get into this on opening, is that there's discussion about, does protein expression mean the same thing as mRNA transcripts? Both experts on both sides acknowledge that they're not equivalent. And so just because you show mRNA expression doesn't necessarily mean that you get protein expression. Now that brings us back to whether there's written description support in FERC's application for its claim. I have to admit, this is a confusing case because we have a number of applications. Depending on what issue you're looking at, you look at different specifications for the claim construction. So let's walk through this. With the written description of the FERC claim, we look at the host specification and say, how is co-express defined? There's nothing in the specifications that says, when you're analyzing expression of the protein, mRNA is sufficient to show expression of the protein. I mean, that's our ultimate point here with respect to the claim construction. So then you go back. With that claim construction, you say, well, claim construction for co-express, you have to demonstrate expression of the protein. So then we go back to the FERC specification and look at what's disclosed in that specification. So either the 037 patent or the 256 application. They're both the same specifications. Nowhere in that specification do the inventors ever state that expression of mRNA is the same as expression of a protein. Dr. Keating, FERC's expert, acknowledged that they're not sufficient. That's the only way protein is expressed? From the RNA or the DNA. So why do you have to say so? Your Honor, I would respectfully disagree with that premise, both from a scientific perspective, but also based on the evidence in this record. Because this is exactly what I was saying. Dr. Keating, FERC's own expert, acknowledged that showing mRNA transcripts in a cell is not enough to show protein expression. Well, then you would have no interference in fact. Correct, Your Honor. There is no interference in fact here. Now, let me bring you to a second point, though. And this goes to really what this case is about in terms of both written description and interference in fact. And this is how it's been presented from day one. And this is going back to 2005. This is how long this case has been going on. FERC has always argued that the cell population that is disclosed in the FERC specification, O37, inherently expresses both CD90 and CD49C. We acknowledge that the specification demonstrates that it expresses CD90. The specification doesn't say that the cells express CD49C. Our experts support that conclusion. Now, if you go back and you look at every publication that Dr. Fervai, one of the inventors, published, not a single time did she or her group ever identify CD49C as a protein associated with this particular stem cell population. So that's one point. I mean, that by itself is substantial evidence. Second, though, and this gets to our broader argument about the Dean's Declaration, and I think this is to your question, Judge Schall, is that, and this is really what the board picked up on, is that, and it gets to the inherency argument. They've always argued that their cells inherently express these two protein markers. Now, to demonstrate that, as was discussed in the case prior to ours, for inherency, you have to show that the invention necessarily leads to whatever conclusion or facet you want to show. To do that, FERC was obligated to show that the method and the cells described in the FERC specification produce the co-expression of CD49C and CD90. They never did that. They never tested, I was about to say that they never tested the FERC cells, but I caught myself. Because if you go back and you look at the cross-examination testimony, and I can pull this up in a second, but if you look at the cross-examination of Dr. Dean's, he acknowledges that they did, in fact, make FERC cells according to the single method disclosed in the FERC specification. They had that data. They never presented it in this case. So what did we do in kind? Well, we looked at the method used. We looked at the science. We have testimony, documents, evidence, demonstrating that when you don't use the same methods, you won't necessarily get the same cells. They used different oxygen levels and a different sort of culture. And a different shape. Correct, correct. And again, these are all factual questions. They're all supported by substantial evidence, but I'll focus on the two. So the oxygen levels. In the FERC specification, it's silent on oxygen, but Dr. Dean's, Dr. Keating, and our expert, Dr. Finney, all state that when a reference is silent about oxygen, it's what they call normoxia, 20%, 21%. It's what we're breathing right now. In the Hoag specification, they're specific. The method used to make the cell is 5%. In the Dean's declarations, 5% oxygen. And I suspect part of that is because, and this is consistent with the other evidence in the record, is that there's this long history of no one being able to reproduce these so-called MAPC cells that are disclosed in the FERC specifications, but could never be reproduced, and that were subject to the retracted articles and the falsified data. Again, I'm not bringing up an ethnoconic. It all goes back to a factual dispute that appellants raised in their blue brief, saying that this was not an unpredictable field. Is there evidence about that 5%? I mean, I think I see where you're going with that, but is there evidence that they were manipulating it for that purpose? No, Your Honor. I didn't mean to say that that's why they did that, but it's an inference that I'm just talking off the top of my head. I don't want the court to rely on that. You're just asking the court to rely on the fact that a different oxygen level was used. Yes, Your Honor. And consistent testimony by both experts, acknowledging that when you change the oxygen level, you don't know how that will affect. I'm being generous here when you say you don't know, because I also believe that there's evidence saying that with respect to certain markers, you know for a fact that protein markers will change. And in fact, it's in Keating's testimony. There's a profile reference that specifically states, it's a 2005 profile reference, and in 2005 they had changed the oxygen levels. So ultimately, in a broad picture, this is a question about, with respect to the written description analysis, is whether there is written description support, inherent support, that the cells disclosed in the first specification, made by a single method, inherently express the two markers that they now claim in their patent. Now, we're not saying that they didn't invent certain types of cells. But what we're saying is that there's no evidence to demonstrate that they had possession of a population of cells that co-expressed these two markers. Now, and I acknowledge that. I think our argument was primarily based on the 91% limitation. But I think when you analyze the Dean's declaration, and you understand that they're not representative of what's in the first specification, the actual limitation of the co-expression doesn't matter. Because they haven't demonstrated 70%. They haven't demonstrated any co-expression. Now, the one last thing, I have a couple more minutes. In addition to the oxygen level, we have the medium. That's different. And, in fact, in the second Dean's declaration, Dr. Dean's never even specified what media he used. And, Judge Wallet, to your point earlier, it's the shape of the cell, the density. I think they're tied together. It's the shape of the flask, wasn't it? It is, Your Honor. And to be specific, so in the Dean's declaration, they used what's called a T75 flask. And it's sort of like a rectangular flask. In the FERC application specification, they used 96-well plates. And if you've ever seen those, they're smaller. And really what that gets you, and the experts explain this in their declarations and their testimony, is that it affects cell density. It affects how the cells interact with other cells. And all of these factors go into what types of cells you will get. And this could have been a very simple case for FERC or ADT. I mean, all they had to do was produce the evidence that they already had. Produce the evidence relating to the cells that they made according to the FERC method that Dr. Dean admitted that they had made at some point in the past. But they never did that. Because they had copied the claims. Yes. And so the board ordered that the copied claims be canceled. Does that take us again to the no interference in fact conclusion? Your Honor, let me address that, I think, two ways. First, with respect to the no interference in fact. And this goes, again, if you look at the blue brief. My job here is to respond to the arguments that the appellant has raised. And if you look at the blue brief, every single argument that they put forth with respect to the no interference in fact conclusion by the board relies on arguments and evidence presented with respect to either the 037 or the 118 patent. So they stand and fall together in a way. Now, I suspect that my colleague could have presented another argument or could have disputed other things. For example, as the court probably knows, when you do a no interference in fact, you have to demonstrate two-way anticipation and non-obviousness. But it was a board conclusion. Correct, Your Honor. And it's before us. Yes, Your Honor. Yes. But my point being is that my colleagues don't differentiate between any underlying facts or subsidiary facts upon which that conclusion may lie. They tie them all together. Stan, let me ask you one thing. If one were to conclude that there's a lacking of written description support, which you're asking us to do, how can there be an interference? It's a good question, Your Honor. If a patent isn't valid because there's no written description support, how can you get to interference? Your Honor, I think it's a good question. And I think it's not exact. The board doesn't really state or explain why. And it's a little confusing in that respect. But, again, I think the point being is that there is no interference in fact because there's no written description. And there's no written description because the cell populations are different. And that's really, you know, whether it's Rulon as lack of written description or lack of interference in fact, it ultimately comes down to the single linchpin that the appellants have presented, basically that the Dean's Declaration inherently shows that the FERC cells are the same as the host cells. And it doesn't demonstrate that. And one last quick point, Your Honor, with respect to the 118 claims, again, these are claims that are trying to claim an adult human cell, any type of cell from any type of organ that can differentiate into any other type of cell. The record is clear that no one has ever even proven that or even done that to date. But on top of that, we have our expert testimony both in the declaration, the cross-examination, and we have testimony from the other side acknowledging that the disclosure that's in the FERC specification is much, much narrower than what's described and claimed in the 118 patent. Are there no further questions? Thank you, Mr. Doe. Thank you, Your Honor. Mr. Huntington for rebuttal. Your Honor, the first thing I want to address is this idea about whether message is an appropriate, message RNA measuring for that is an appropriate way of detecting expression. If you look at appendix page 57, this is the 685 application, and it specifically says, this is the whole application, techniques to detect the molecules of interest can also include quantitative PCR. Quantitative PCR detects message. It does not detect protein. What page is that again? Appendix page 57. What line are you on? Line 28, the very last line. The last two lines there. So the point is, Hoh agrees with that. We say that in our application. It is unreasonable and contrary to the intrinsic evidence to go and say, well, the experts say this, when the intrinsic evidence says that you can detect message. So that's why that's just completely wrong. The second thing that I want to say is this whole idea that somehow this falsification of evidence comes into this case is absolutely false. I realize that's probably a play on words, but what they're trying to do is throw mud on this and say, there is nothing in that decision that says anything that they considered about that at all. It is unreasonable to look at that and consider that as a part of anything on this decision. That was not evidence they considered. With respect to these six differences. It can still be relevant, though. It could be relevant if the board had considered it, but you're reviewing this board's decision. The board did not decide anything about it. It expressly said we did not decide it. Well, he's saying it's representative of the uncertain state in the art. He's saying that, but that's not what the board said. He's trying to bring new arguments in. He's trying to throw mud on this by saying, oh, it's uncertain, et cetera, for reasons that the board didn't adopt. With respect to the question of whether you look at both applications, the 685 and the 244, I'd refer you to the Tobetic decision, where it refers to the fact that you look at both specs. With respect to the question of whether the FERC application discloses the 49C, I would refer you to appendix page 220. This is the 037 pattern. Column 17, line 7, where it specifically says CD 49C. It is clear that CD 49C is in the FERC patent application. The other thing I want to say with respect to these differences, yes, they are different. No question. But they are differences that are within the scope of the Ho application, and they're within the scope of the FERC application or the skill in the art. There is a second dean's declaration in the case, in the 256 case, that goes through and details all of the knowledge in the art about oxygen levels. And the last thing I want to leave you with is, Ho says that none of those six things make a difference with respect to their getting their cells. There's no process limitations in their claims. And yet now they're saying, oh, you have to do all of these things to get our cells. Well, if that's the case, this court should say that, so that the public is on notice of the fact that they have an extremely limited claim, and not one that just has two markers and a double print. If their cells can be produced this broadly, why wouldn't an experiment, the dean's experiment, go through and be sufficient as long as it follows within those same parameters? Thank you. Those are part of the questions in this science that are still being resolved. These are examples. Okay, thank you both. The case is taken under submission.